The LINCOLN NATIONAL LIFE
INSURANCE COMPANY,
Plaintiff,

v.

The GORDON R.A. FISHMAN IRRE-
VOCABLE LIFE TRUST; Harvey
Schwitzer, as Trustee of the Gordon
R.A. Fishman Irrevocable Life Trust;
Gordon R.A. Fishman; Hannareta
Fishman; Mutual Credit Corporation;
and Spurling Group II, LLC, Defen-
dants.

No. EDCV–07–1338–SGL (OPx).

United States District Court,
C.D. California.

July 10, 2009.

Stephen Baker and Jason Gosselin,
Drinker Biddle & Reath LLP, Philadel-
phia, PA, William Hanssen, Suzanne V.
Stouder, James Bainbridge, Drinker Bid-
dle & Reath, Los Angeles, CA, for Plain-
tiff, Lincoln National Life Insurance Com-
pany.

Peter Bicks, Orrick Herrington & Sut-
cliffe LLP, New York, NY, Khai LeQuang,
William Molinski, Christopher Chaudoir,
Melanie Phillips, Orrick Herrington & Sut-
cliffe, Los Angeles, CA, for Defendants,
Mutual Credit Corporation and Spurling
Group II, LLC.

ORDER DENYING PLAINTIFF'S MO-
TION TO DISMISS AND GRANT-
ING DEFENDANT MUTUAL
CREDIT CORPORATION'S AND
SPURLING GROUP II, LLC'S MO-
TION FOR SUMMARY JUDG-
MENT

STEPHEN G. LARSON, District
Judge.

Plaintiff The Lincoln National Life In-
surance Company ("Lincoln") has brought
this case, arguing that its issuance of three
$10 million insurance policies on the life of
Dr. Gordon R.A. Fishman was unlawfully
procured by the increasing prevalent prac-
tice of unrelated third parties taking, at

the outset, a stake in life insurance policies (sometimes referred to as stranger originated or owned life insurance ("STOLI") or investor owned life insurance ("IOLI")), rendering the same void and thereby relieving Lincoln from having to pay out on those policies when they come due.

Defendants Mutual Credit Corporation ("MCC") and Spurling Group II, LLC, joined by defendant Harvey Schwitzer, serving as trustee of The Gordon R.A. Fishman Irrevocable Life Trust, who helped finance Dr. Fishman's ability to take out and pay the premiums on such life insurance policies, have since filed a motion for summary judgment, arguing that the evidence indicates that, for a period of time from when the policies where first secured and for a two-year period thereafter, the holder of the policy was the person named as the insured thereon (Dr. Gordon R.A. Fishman), or at least, someone with an "insurable interest" in the same.

In return, Lincoln has responded by filing a motion to voluntarily dismiss its case as moot, arguing that the insurance policies in question have since lapsed due to non-payment of their premiums, and thus there is no longer a controversy to resolve as there is no insurance policy in effect upon which to adjudge its validity; Lincoln ostensibly not having any obligation to pay on the policies due to their lapse.

### Lincoln's Motion to Dismiss

The Court need not tarry long with Lincoln's motion. It only seeks to dismiss its case "without prejudice." If the case is, as Lincoln says, moot because the policies at issue have lapsed and no longer can be enforced against it to make payments thereon, then there is little reason why Lincoln's claim that the policies were void at the outset should not be dismissed with prejudice. The failure to enter such a dismissal postulates the possibility that Lincoln could renew its claim down the road, but that very fact would indicate that the case and controversy is not moot, otherwise there would be no need to retain the ability to resurrect later the very claims now sought to be dismissed. If the policies have truly lapsed and are no longer enforceable against Lincoln (and defendants dispute that point, noting that there are provisions for policies to be resurrected if payment is made within a given time after the policy has lapsed), then any said dismissal should and must be *with* prejudice. And in point of fact, Lincoln's counsel conceded that the need for dismissal without prejudice was to preserve his client's rights should defendants file a separate suit seeking payment on the policies or file a declaratory relief claim contesting that the policies had lapsed. Said concession only reinforces the point that the asserted lapse of the policies does not obviate or otherwise moot the question presented in this case—the validity of the policies themselves.

Finally, it must be remembered the procedural posture in which the Court finds itself in this matter. This case was filed in 2007, the discovery period has closed, and trial is set in this case for July 14, 2009. To allow Lincoln the opportunity to resurrect its claims (in the form of a defense or counterclaim) down the road at this point (which is what a dismissal *without* prejudice would allow) is grossly prejudicial to defendants and entirely wasteful of the judicial resources that have been expended thus far in this matter.

Given the amount of time and effort expended thus far in litigating this case, Lincoln must make a choice of whether to dismiss its claims with prejudice or to litigate them to their conclusion now. Having chosen against dismissing its void claim with prejudice, the Court likewise **DENIES** Lincoln's motion to dismiss.

*Defendants' Motion for Summary Judgment*

Turning now to defendants' summary judgment motion, it is apparent that the split amongst the parties in resolving the motion centers over whether the Court should give effect to the form of the agreements executed by and amongst defendants, or whether the Court should ignore those formalities and look behind those agreement's terms to give effect to the purported machinations the defendants engaged in and sought to achieve by and through those agreements (form versus substance). Because this case is a contract case (whether the insurance policies taken out were void as being a stranger in interest transaction), the Court cannot ignore all those formalities in adjudicating a claim of an agreement being void.

The following facts are undisputed by the parties:

Starting in early 2005 and continuing through September of that year, an officer in Lincoln's compliance department evaluated and monitored the number of policies financed using MCC's loans. An officer in Lincoln's compliance department was aware that Lincoln had continued to issue MCC financed policies from early 2005 through September of that year. In total, including the policies at issue, Lincoln issued more than 80 life insurance policies financed using MCC's non-recourse premium financing loans. Lincoln also issued several dozen policies financed by other non-recourse finance lenders, such as Coventry, XE–R, Liberty Ocean Vista, Redwood, Canyon, Premium Finance Plus and a few others.

Months before the policies at issue entered into force, Lincoln representatives learned of the specific terms of the premium finance loans offered by MCC.[1] At that time, Lincoln's representatives learned, among other things, that MCC loans were non-recourse (that is, secured only by a collateral assignment of life insurance policies purchased with the loan proceeds), included a contingent interest component in addition to fixed interest, and provided a "premium reserve" to borrowers. Lincoln's representatives were also informed that, in addition to repaying their loans to MCC, borrowers also had the option to sell the policies in question upon the loan's maturity, or surrender their policies to MCC in full satisfaction of their debts. Sample promissory notes memorializing the terms of MCC's non-recourse loans and other loan documents were provided to Lincoln at its request. Based on the information made available to it, Lincoln's compliance counsel was able to evaluate whether MCC's non-recourse premium finance loans raised any legal or compliance issues.

In early 2005, Lincoln started to become concerned in general that policies were being sought not for legitimate insurance-related purposes, but to be re-sold in the secondary market. To that end, on March 18, 2005, Lincoln sent a bulletin to its entire agency force explaining that any involvement in stranger owned life insurance ("SOLI") and investor owned life insurance ("IOLI") was prohibited. In particular, Lincoln expressed concern that "individuals are being recruited to consent to the purchase of life insurance and annuities on their lives." Lincoln's bulletin specifically addressed situations where insured are told "they can receive 'free' insurance for a year or two, with the option to retain the policy by repaying the loan." The bulletin explicitly advised that Lincoln

---

1. The policies at issue were issued by Jefferson Pilot Life Insurance Company, which subsequently merged with Lincoln. For purposes of this motion, Lincoln shall include Jefferson Pilot.

"will no longer accept applications for life or annuity policies sold under SOLI or IOLI programs."

MCC then met with representatives from Lincoln's sales, compliance, and legal departments on April 22, 2005, to try to persuade Lincoln that its program should be deemed acceptable by Lincoln. At the conclusion of the meeting, MCC's representatives agreed to provide follow-up documentation so that Lincoln could analyze the programs in more detail. A few days later MCC provided to Lincoln a sample irrevocable trust declaration and secured non-recourse promissory note, among other documents. On May 17, 2005, MCC or its representatives were informed that its program was not approved and that it should stop sending applications for policies intended to be financed by MCC. As of that time, fifty policies financed by MCC had already been issued. It was agreed that pending applications would continue through the underwriting process. Twenty policies were later issued based on previously pending applications.

Prior to the fall of 2005, the only way Lincoln's underwriters had a way of knowing whether a policy was financed by MCC was by whether the policy involved a producer known to be affiliated with MCC's program. In the summer and fall of 2005, Lincoln increased its efforts to identify and prohibit STOLI policies, including policies procured through MCC's program. These efforts included the inclusion of questions concerning premium financing in the financial inspection reports conducted by outside agencies. In fact, the financial inspection conducted with respect to the Policies included direct questions as to whether premium financing was contemplated, and Dr. Fishman denied any intent to use premium financing. Lincoln's efforts also included instructions to underwriters concerning problematic programs and other "red flags" for STOLI policies. Nonethe-

less, thirteen MCC policies were applied for and issued after May 17, 2005 despite Lincoln's efforts to keep them out. Among these thirteen policies are the three Fishman policies at issue in this case.

Later, on December 5, 2005, Lincoln issued yet another company wide bulletin informing agents that subsequent to the March bulletin the company had noted "numerous creative variations of STOLI/IOLI programs have emerged, including platforms offering 'free' or 'no cost' insurance, some with up-front inducements, typically for a two or three year period, and targeting older individuals with high net worth who can qualify (regardless of need) for large amounts of insurance and contemplate a life settlement of the policy within a 2 or 3 year period."

In 2005, Dr. Fishman learned about the MCC program from a friend at his synagogue. Dr. Fishman further learned that the program would allow him to receive a cash payment. This information prompted Dr. Fishman to contact Mr. Kevin Burke, a promoter of MCC's program. In a telephone conversation, Mr. Burke confirmed that Dr. Fishman needed to pass a physical examination to qualify, that the program would involve the creation of an irrevocable trust to hold the insurance, and that the trust would receive money for participating. In addition, Mr. Burke offered referral fees as high as $100,000 to individuals such as Dr. Fishman who referred new clients to him.

Dr. Fishman then formed the Trust as a vehicle to purchase and hold life insurance policies on his life by executing an Agreement and Declaration of Trust (the "Trust Agreement"). Dr. Fishman sought the policies at issue as part of his estate plan, specifically to cover expected estate taxed on his $90 million worth of commercial real estate holdings. Lincoln disputes this, ar-

guing that Dr. Fishman executed the Trust Agreement at the behest of MCC, and that the Trust was a vehicle for MCC to acquire policies that it knew it could not acquire directly, but as part of a scheme to get around insurance laws prohibiting acquiring such direct interests.

At the time that Dr. Fishman had three existing policies of life insurance. The first policy was taken out in 1972 and had a face amount of $25,000. In 1988, Dr. Fishman took out a $2 million policy with Protective Life. In 1991, Dr. Fishman took out a second $2 million policy with Bankers Life. At no time before or after Dr. Fishman engaged in the creation of the Trust noted above or secured the MCC policies did he consult with his long time insurance advisor, Mr. David Phillips, regarding purchasing more insurance policies.

Trusts are a common estate planning tool used to hold life insurance policies so that, after an insured passes away, the policy proceeds may be used to pay his or her estate taxes. The Trust Agreement designates Dr. Fishman's four sons (Jeffrey Fishman, Michael Fishman, Bradley Fishman, and David Fishman) as the Trust's beneficiaries. Further pursuant to the Trust Agreement, one of Dr. Fishman's sons (David Fishman, who is financial consultant and has a Harvard MBA), was appointed the Investment Trustee of the Trust. Dr. Fishman's four sons remain the sole beneficiaries of the Trust.

The Trust Agreement designates Harvey Schwitzer as the Administrative Trustee of the Trust. A majority of Dr. Fishman's sons, the Trust's beneficiaries, are empowered to remove Mr. Schwitzer as Administrative Trustee, with or without cause, at any time.

The Trust Agreement confers "full power and authority" to manage the Trust's assets upon the Investment Trustee, David Fishman. The Trust Agreement also au-thorizes David Fishman to cause the Trust to (I) acquire insurance policies on the life of Dr. Fishman, (ii) borrow funds to procure such policies by issuing promissory notes, and (iii) enter into agreements assigning the policies to the lender as security for the amounts due under those notes. David Fishman, the Investment Trustee, has the sole responsibility to decide whether to acquire life insurance policies and the terms of such acquisitions. In a letter dated August 17, 2005, and pursuant to the express authority conferred upon him by the Trust Agreement, David Fishman authorized Mr. Schwitzer to execute all documents in association with the acquisition and financing of certain life insurance policies, including the policies at issue in this case that were issued by Lincoln numbered JF–5524737, JF–5524738, and JF–5524743 ("the Policies").

Aside from limited responsibilities delegated to him by David Fishman, the Investment Trustee, Mr. Schwitzer had no responsibility for the purchase or financing of the policies.

Prior to applying for the insurance policies in 2005, Dr. Fishman discussed with his tax attorney the potential tax treatment of the premium reserve that he would receive under MCC's program. Further, the tax attorney estimated Dr. Fishman's actual insurance need to be between $25 and $30 million in order to protect against estate taxes.

Dr. Fishman and the Trust submitted applications to Lincoln's predecessor in interest, Jefferson Pilot, seeking to purchase the Policies on August 24, 2005. At the time he signed the applications, Dr. Fishman was unaware that the three $10 million policies were being sought on his life. Lincoln's underwriters learned that Dr. Fishman's net income was $3.8 million from Total Financial, Lincoln's agent. This figure was confirmed by Dr. Fish-

man's accountant. In the application it was further disclosed that Dr. Fishman's gross income was $13.8 million and his net worth was $90 million, which were confirmed by his accountant through Lincoln's agent, Total Financial. Lincoln's underwriters approved the Policies based on both Dr. Fishman's gross income and net worth.

Under the Policies' terms, Lincoln pledged that it would "not use any statement by or for [Fishman] to void [the Policies] or to deny a claim unless it is confirmed in [a Policy] application." After a process lasting over a month, several underwriters, those who make the decision to issue life insurance policy, including the head of the underwriting department at Lincoln, reviewed the application submitted by Dr. Fishman and the Trust and approved the issuance of the Policies. Other than the receipt of an additional inspection report prepared by Examination Management Services, Inc., at Lincoln's request ("the EMSI Report"), no further underwriting activity was undertaken by Lincoln after the Policies were issued. The underwriters who made the decision to issue the Policies did not review the EMSI Report. At the time the Policies were issued and entered into force, Lincoln had not promulgated underwriting guidelines intended to identify and prevent the issuance of stranger-owned life insurance ("SOLI")/investor-owned life insurance ("IOLI") policies and policies financed with non-recourse loans.

Before the Policies went into force, a compliance manager at Lincoln became aware of facts which led him to suspect the Policies were financed through MCC. On October 6, 2005, a week before the Policies were placed into force, Lincoln's compliance manager wrote an e-mail to, among others, a senior underwriter and compliance counsel at Lincoln informing them

that he suspected that the Fishman Policies were being financed by MCC.

That said, the collateral assignments of the Policies sent to Lincoln by MCC, on Lincoln's own forms, specifically referenced MCC's premium financing as the reason for the assignments. Lincoln recorded the collateral assignments to MCC of the Policies without objection, as it had recorded collateral assignments for other life insurance policies financed by MCC.

At some point, the parties dispute when (defendants contend it was after the Policies were issued, but Lincoln contends it was *before* they were issued), the Trust applied to MCC to obtain financing to pay the premiums for the Policies. Under MCC's financing program, the financing from MCC would be sufficient to cover three items: (a) "premium reserve", (b) two years of premium payment, and (c) an origination fee. Although MCC's program involve a "premium reserve" of up to three percent of the face value of the policy, there was no requirement that the premium reserve be used to pay premiums. Instead, the premium reserve was a cash payment to the trust that could be used for any purpose the insured chose. One Kevin Burke described the premium reserve as a "fee to individuals" given in exchange for "their 'unused capacity to acquire retail life insurance.'" Under MCC's premium finance program, if a "borrower" wanted to retain the policy at the conclusion of the two-year loan term, it was obligated to repay the Principal Amount together with a "Finance Charge," which in turn consisted of two components: (1) regular interest calculated at 10% per year, and (2) an additional Contingent Interest component that varied depending on the secondary market value of the policy at the end of the loan term.

Under the terms of the note, the Contingent Interest portion of the Finance

Charge was capped at 10% of the face value of the policy. Thus, for example, the premium on one $10 million policy with Lincoln was $700,000 for the first two years and the total "premium reserve" was $1.2 million. A borrower could simply return the policy to MCC "for full settlement of the debt." If the borrower elected that option, it had no obligation to return the premium reserve. Towards that end, the President of MCC and Spurling testified that some trusts have elected to retain the policies and repay the loan in full. However, of the eighty plus policies issued by Lincoln that were financed by MCC, excluding the Fishman policies at issue, not a single original trust retained ownership of the policies after expiration of the contestable period. MCC's funding source, XE Capital, has been described elsewhere as a "hedge fund" that invests in life settlements.

Regardless, conforming to its standard financing program, MCC approved the Trust's applications and the Trust borrowed a total of $2,842,107 from MCC, the amount being enough to cover two years worth of premiums on the Policies ($2.1 million) with the remainder to cover origination fees, and a "premium reserve" to be managed and distributed at the Investment Trustee's sole discretion. The terms of the loans extended to the Trust by MCC were set forth in three Secured Non-recourse Promissory Notes (the "Notes") also executed by the Trust, pursuant to David Fishman's directive. Each of the Notes corresponded to one of the Policies.

Under the terms of each Note, the Trust covenanted to repay the principal sum of $947,369, interest at a rate of 10% per annum, and an additional amount of "Contingent Interest." Contingent Interest was defined in the Notes as "an amount equal to the lesser of (x) $1,000,000 and (y) the amount, if any, by which the fair market value of the Policy ... as of the Matu-

rity Date exceeds the outstanding principal and accrued interest (other than Contingent Interest) under this Note." Each Note was secured by a collateral assignment of a corresponding Policy on terms set forth in an Assignment of Life Insurance Policy ("Assignment") dated October 14, 2005. Each Assignment gave MCC a security interest in one of the Policies limited to the amount of the Trust's debt to MCC under the corresponding Note, including interest. Each of the Assignments was executed by the Trust and by Dr. Fishman.

In connection with the financing transaction, Dr. Fishman and his wife executed a Consent and Acknowledgment Agreement in which they consented to the Trust's purchase of the Policies and the collateral assignment of the Policies to MCC as security. The Consent and Acknowledgment Agreement provides that the Trust was the sole owner of the Policies. In the Consent and Acknowledgment Agreement, Dr. Fishman and his wife also agreed that if the Trust defaults on the Notes, MCC is entitled to foreclose on the Policies in satisfaction of the Trust's debt. When the Notes matured on October 13, 2007, the Trust had several options with respect to each of the Policies: It could (I) repay its debt to MCC and retain the Policy, (ii) sell the Policy to a third party, or (iii) surrender the Policy to MCC in satisfaction of its debt.

The Trust surrendered all three of the Lincoln policies. The Trust only elected to surrender the Policies after Dr. Fishman consulted with Julian Movsesian, owner of the company Capital Management Systems. Mr. Movsesian advised Dr. Fishman that he should seek to have Lincoln cancel his Policies and obtain new policies. Dr. Fishman concluded from his consultation with Mr. Movsesian that the Policies were "risking [his] whole estate plan on

policies that [he] couldn't trust." Dr. Fishman applied for new policies through Mr. Movsesian, but they were "turned back." Mr. Movsesian referred Dr. Fishman to an attorney, Roger Grad, who sent a letter to Lincoln on May 31, 2007, seeking to have the Policies rescinded and new policies issued (the "Grad letter"). In the letter, Mr. Grad stated that the Policies were sought as part of an effort at the outset to "purchase Dr. Fishman's insurability rights," and later sell the Policies to investors. Although Lincoln had in its possession the form MCC loan documents before filing suit, no one at Lincoln compared these documents to the Grad letter to determine if Mr. Grad was accurately describing the terms of those agreements. Lincoln did not attempt to contact MCC before filing suit to determine if Mr. Grad's letter accurately described MCC's loan program. Dr. Fishman later testified that the Grad letter contains numerous inaccuracies.[2]

### Analysis

As noted at the outset, resolution of this case comes down to the simple question of whether the policies issued by Lincoln were void at the inception because they were a stranger owned life insurance policy, which is prohibited under California law. If not, then Lincoln's claim is without merit and summary judgment must be awarded to defendants. If so, then summary judgment should not be awarded to defendants. The Court thus turns to analysis of California law on stranger-owned life insurance policies.

■ Insurable interest is defined under California law as an "interest based upon a reasonable expectation of pecuniary advantage through the continued life, health or bodily safety of another person and conse-

quent loss by reason of that person's death . . . engendered by love and affection in the case of individuals closely related by blood or law." Cal. Ins.Code § 10110.1(a). Bringing this point home and putting teeth into the requirement that an insurable interest exist is the statutory prohibition that "any contract of life . . . insurance procured or caused to be procured upon another is void unless the person applying for insurance has an insurable interest in the individual insured at the time of the application." Cal. Ins.Code § 10110.1(f). Further, and more importantly for purposes of this case, section 286 of California's Insurance Code provides that "an interest in the life or health of a person insured must exist when the insurance takes effect, *but need not exist thereafter* or when the loss occurs." (emphasis added). Thus, once purchased, a policy is freely alienable and may "pass by transfer, will or succession to any person, *whether or not the transferee has an insurable interest.*" Cal. Ins.Code § 10130 (emphasis added). As one California appellate court remarked long ago, this statutory provision was meant to "set at rest any question as to the assignability of a life insurance policy and also to affirm the right to make such assignment to a person having no insurable interest in the life of the insured." *Lewis v. Reed,* 48 Cal.App. 742, 746, 192 P. 335 (1920). Thus, read in conjunction with one another, California law provides that, for a insurance policy to be valid, it must, at its inception, have been held by someone with an insurable interest in the person so insured under the policy, that is to say, by someone who has an interest and advantage in "the continued life, health or bodily safety of" the insured and who would suffer a "conse-

---

2. In its later filed suit, Lincoln also alleged a claim against Dr. Fishman and his wife, predicated upon alleged misrepresentations on Dr. Fishman's part in getting the insurance com-

pany to issue the policies. The parties later stipulated to dismissal of this claim with prejudice.

quent loss" where any of those situations to come to pass.

■ Here, it is hard to deny that, based on the formalities taken by the defendants, an insurable interest (a real or potential beneficial interest) existed at the time the Policies were issued. The Trust, which Dr. Fishman formed and which held the Policies when they were issued by Lincoln, clearly has an insurable interest in his life. It is well established that an irrevocable trust, such as the one in this case, may purchase and hold life insurance policies on the life of its settlor. Moreover, Dr. Fishman's sons, who were the ultimate beneficiaries of the Trust, also have an insurable interest in their father's life as, again, California law defines relation "by blood" as rendering it an insurable interest. Thus, simply looking at the form in which this transaction took place, the Court would agree with defendants that "the Policies were purchased by the Trust with the approval of Dr. Fishman and at the direction of his son, David Fishman, the Investment Trustee, for the ultimate benefit of Dr. Fishman's sons. All of [them,] Dr. Fishman, his sons, and the Trust had an insurable interest in Dr. Fishman's life at the time the Policies took effect." (Mot. Summ. J. at 12). And, indeed, Lincoln concedes the point. (Opp. at 19 ("It is true that Dr. Fishman has an 'an unlimited insurable interest in his own life,' and that his sons have an interest 'engendered by love and affection.' It is also true that a trust or a creditor of Dr. Fishman could have an insurable interest in Dr. Fishman's life")).

Instead, Lincoln seeks for the Court to focus on MCC—the fact that it was almost immediately awarded a collateral assignment on the policy, the general practice and nature of MCC's program, and the allegation that the form in which the transaction went down with the Trust was nothing but a sham and that the Court therefore should basically pierce the contract/agreements' formalities and construe the transaction as actually conceived and intended by the parties. (Opp. at 3 ("the Court should consider all the undisputed material facts, the totality of which demonstrates that ... the Trust's ownership of the policies was merely one aspect of a larger scheme") & 19 ("the fallacy of defendants' position, however, is that it requires the Court to accept the legitimacy of the transaction despite a multitude of evidence that show it was a sham ... [and later describes it as] a elaborate charade")). Lincoln then turns to the statutory prohibition against an insurance policy being procured or caused to be procured without an insurable interest as an apparent means to find a way to allow it (and the Court) to look behind the formalities of the agreements and get to the not-so-subtle deviousness on the part of MCC. That is all well and good, but the statutory provision cited by Lincoln concerns efforts to procure policies without an insurable interest at the inception, which only brings the issue back full circle to the evidence presented by defendants that such an interest is and was filled at the outset (even if in, Lincoln's view, as an obvious placeholder). Despite its valiant attempts to expose MCC's alleged scheme for the true "charade" it is, the simple fact remains that the law, as it is currently structured, allows for an arrangement as that concocted by MCC. Notably absent from Lincoln's argument is *any* citation to authority from *California* (as opposed to citation to a federal district court opinion from Florida, New Jersey, and Minnesota, as well as bulletins issued by various state insurance regulators warning against the type of deal structured by MCC) allowing a court to basically look behind the terms and other formalities of an insurance agreement(s) and basically re-write it to reflect what was really going on between the vari-

ous parties thereto insofar as determining the existence (or lack thereof) of an insurable interest to an insurance policy.[3]

In any event, Lincoln's argument is well-answered in defendants' papers: "Lincoln may not avoid its obligations under the Policies merely because Dr. Fishman or the Trust ... intended to exercise the right to sell or transfer them at some point in the future. Dr. Fishman's intent, and the intent of the Trust to exercise its rights, standing alone, are legally irrelevant." (Mot. Summ. J. at 14).

The problem, as pointed out by defendants, is that when MCC took out a collateral assignment on the Policies said assignment was limited to that of a secured creditor, not an owner or absolute assignee. This is critical because California law recognizes that the fact a insurance policy is secured by assignment to a creditor does *not* change or otherwise impact the determination of whether an insurable interest exists (a proposition that may well change with legislative hearings in the California legislature). *Curtiss v. Aetna Life Ins. Co.*, 90 Cal. 245, 252, 27 P. 211 (1891). The fact of the matter remains that indeed for a two year period Dr. Fishman through his Trust held a insurance policy on his life which if he died during that period would have inured to the benefit of his sons, minus whatever interest MCC had as a creditor on the financing arrangement. The Court has not seen any suggestion by

Lincoln that MCC's creditor interest equaled or exceeded the face value of the policy (defendants make this observation on this point: "the terms of the Assignments expressly provide that, in the event of Dr. Fishman's death, MCC's interest in the death benefit paid by Lincoln was limited to the amount of the Trust's debt to MCC, including interest" Mot. Summ. J. at 12). So the fact remains that for two years this not only had the formal appearance of a legitimate life insurance policy on Dr. Fishman's life for the benefit of someone with an insurable interest in the same, but was in fact true as well.

All that being said, and despite the fact that the Court finds that the law compels that it award summary judgment to defendants, it must be added that MCC's finance program skirts close to the letter, and certainly can be viewed as violating the spirit, of the law. Defendants may have found a loophole in the law barring a STOLI finding, but it is clear to the Court that this whole arrangement with the Fishmans was nothing but a more creative version of the same. Unfortunately for Lincoln, the law as it presently exists allows this kind of insurance arrangement to be valid. In such a circumstance, it is perhaps best to follow the wisdom expressed long ago by President Ulysses S. Grant, who said that "the best way to get rid of a bad law is to enforce it." *State ex rel. Skilton v. Miller*, 164 Ohio St. 163, 128

---

**3.** Lincoln does make the representation that "at least one court interpreting California law has suggested that non-recourse premium financing presents insurable interest questions," (Opp. at 22), but nowhere provides a citation to the case referenced. Likewise, Lincoln has filed a post-hearing supplemental brief, acknowledging that "there are no California decisions addressing this issue [of a court's ability to 'look behind' the transaction documents] in the context of a STOLI," but then makes appeals to other contexts (namely, real estate transactions and income taxation)

where such a sneak peek behind the formalities in a document is permitted. (Pl's Suppl. Memo. at 1–2). Those citations are unpersuasive as the problem the Court is confronted with is not simply the party's characterization of their agreements (as in the cases cited by Lincoln), but the realities of how the transaction was structured to operate. What Lincoln is truly asking for the Court to do is ignore those realities and examine the intent of the parties in entering into the agreement in the first instance.

N.E.2d 47, 52 (Oh.1955) (Stewart, J., dissenting).