Filed 8/23/17
Opinion on rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| FREDERICK MAHAN et al.,<br><br>       Plaintiffs and Appellants,<br><br>v.<br><br>CHARLES W. CHAN INSURANCE<br>AGENCY, INC. et al.,<br><br>       Defendants and Respondents. | A147236<br><br>(Alameda County<br>Super. Ct. No. RG15765392) |

In this appeal we consider whether two plaintiffs, 86-year-old Frederick Mahan (Fred) and his 79-year-old wife Martha Mahan (Martha),[1] have stated a viable claim under the Elder Abuse and Dependent Adult Civil Protection Act (the Elder Abuse Act or the Act)[2] against Charles W. Chan (Chan), the Charles W. Chan Insurance Agency, Inc. (the Chan Agency), Omar Kaddoura (Kaddoura), Cung Thai (Thai), and the American Brokerage Network (ABN) (collectively the Respondents), all of whom provided life insurance advisory services to them.

The facts, as alleged, begin in the mid-1990s when, long before any of the Respondents were involved, the Mahans purchased two life insurance policies, naming

---

[1] For the sake of convenience, we refer to the plaintiffs individually by their first names. We mean no disrespect to them.

[2] Welfare and Institutions Code section 15600 et seq. Unless otherwise specifically designated, all statutory references are to the Welfare and Institutions Code.

1

their children as beneficiaries. Together, these two policies provided death benefits of approximately $1,000,000, at an annual premium cost of $14,000. As part of the Mahans' estate plan, the policies were held by a revocable living trust (the Children's Trust or the Trust), of which their daughter, Maureen Grainger, was trustee. The Mahans made enough money available to the Trust, in advance, so that it would be self-sustaining "for many years to come," with no need for additional cash infusions from them for ongoing premium costs.

More than two decades later, in 2013, when the events triggering this action began, Fred, then at the end of his career as a lawyer, was suffering from confusion and cognitive decline; Martha, who had turned overall control of the couple's affairs over to Fred under a power of attorney, was in an even more precarious state of health, having been diagnosed in 2012 with Alzheimer's disease. Seizing on this situation, the Respondents allegedly carried out an elaborate scheme that involved arranging the surrender of one of the life insurance policies and the replacement of the other with a policy providing more limited coverage, at massively increased cost. The premiums for the new coverage, spread over the term it was to be in force, amounted to some $800,000, forcing the Mahans to feed cash into the Trust to sustain it and, in effect, consuming most of their intended $1,000,000 gift in transaction costs, including $100,000 in commissions to the Respondents.

The Mahans and Maureen (acting for the Trust) sued. Separate demurrers to the first amended complaint (FAC) were filed by Chan, the Chan Agency and Kaddoura (collectively the Chan Defendants) and by Thai and ABN (the Thai Defendants). The focal point of both demurrers was the Mahans' first cause of action, pleaded under the Elder Abuse Act. The thrust of the Respondents' attack was that the Children's Trust owns and has always owned the life insurance policies at issue here, and that all of the commissions paid to the Respondents were paid by or on behalf of the Trust. Whatever money the Mahans paid into the Trust to sustain it, the Respondents argued, was paid voluntarily for the benefit of their children, after the alleged scheme was over. According

2

to the Respondents, the only proper plaintiff is the Children's Trust, which does not have an Elder Abuse Act claim "because [it] is not 65 years old."

Embracing this line of argument, the trial court sustained both demurrers, ruling that the Mahans had not alleged any "depriv[ation]" of "property" owned by them within the meaning of section 15610.30. The court also sustained the demurrers as to the Mahans' remaining causes of action, the second (for negligence), third (for breach of fiduciary duty), fourth (for fraud) and fifth (for violation of Business and Professions Code section 17200), applying in substance the same reasoning—the FAC failed to allege that the Mahans rather than the Children's Trust, suffered harm. Since neither of the demurrers attacked the Trust's right to pursue the second, third, fourth and fifth causes of action, the court's ruling left those claims intact, with the Trust remaining as the sole plaintiff in the action. The court invited the Mahans to amend to allege harm to themselves directly, but they elected to stand on the allegations of the FAC, as originally stated. Judgment was then entered dismissing the Mahans' claims with prejudice, and this appeal followed.

We now reverse and remand.

## I.    BACKGROUND

We review a trial court's ruling on demurrer de novo (*California Apartment Assn. v. City of Fremont* (2002) 97 Cal.App.4th 693, 699), giving "the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citation.] We must also accept as true those facts that may be implied or inferred from those expressly alleged.' " (*Balikov v. Southern Cal. Gas Co.* (2001) 94 Cal.App.4th 816, 819; see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170.) The primary issue here is whether the Mahans have stated legally cognizable harm to themselves. Accepting the allegations in the FAC to be true, as we must at this stage—whether those allegations can be proved is another matter—we conclude that they have done so.

3

The 49-page FAC, to be sure, is not particularly reader-friendly. It begins with some 35 pages of dense background narrative, set forth in 87 numbered paragraphs, bereft of subheadings or clear organizing principles. These undifferentiated background allegations are then incorporated, wholesale, into each cause of action. Because of the FAC's meandering style, the trial court observed it is difficult to discern the materiality of its many allegations, and as a result, if the Mahans chose to amend, the court ordered them to file something more focused and concise. We sympathize with that reaction, having waded through the document ourselves, but in the end we believe the Mahans' core allegations are set forth in reasonably coherent fashion.[3] Beyond the capsule summary provided above, we set forth the relevant highlights, as follows.

## A. Background: The Children's Trust

In the mid-1990s the Mahans "paid an estate planning attorney to create an estate plan" in which the Children's Trust was a critical component. The Trust "was created to hold the insurance policies in the approximate amount of $1 million for the children's future benefit, until after both of the Mahans had passed away. In implementing their estate plan, the Mahans . . . made the . . . Children's Trust sustainable, i.e. they made

---

[3] A complaint, with certain exceptions, need only contain a "statement of the facts constituting the cause of action, in ordinary and concise language" (Code Civ. Proc., § 425.10, subd. (a)(1)) and will be upheld " 'so long as [it] gives notice of the issues sufficient to enable preparation of a defense.' " (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 549–550.) "[T]o withstand a demurrer, a complaint must allege ultimate facts, not evidentiary facts or conclusions of law." (*Logan v. Southern California Rapid Transit District* (1982) 136 Cal.App.3d 116, 126.) However, " '[t]he fact that a party has alleged more than is required to justify his right does not obligate him to prove more than is essential, and the unnecessary allegations will be treated as surplusage unless the opposing party would be prejudiced.' " (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945.) At some point, of course, there is a remedy for undue prolixity: a demurrer for uncertainty. (Code Civ. Proc., § 430.10, subd. (f).) But "demurrers for uncertainty are disfavored, and are granted only if the pleading is so incomprehensible that a defendant cannot reasonably respond." (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1135.) That was not a ground for the demurrers here.

4

enough cash available within the . . . Trust to pay the annual premiums for many years to come.  This gave the Mahans peace of mind knowing that there would be $1 million for their children upon their passing."  For tax reasons, the children are the trustors, and all assets held by the Trust had to be, and are, indisputably owned by Maureen as the trustee and a beneficiary of the Trust.[4]

### B. The Alleged Scheme

#### 1. *The Parties' First Meetings (January-March 2013)*

Sometime in January or February 2013, the Chan Defendants assisted Fred in finding casualty and earthquake insurance for the Mahans' home, and in doing so "succeeded in winning Fred's trust and confidence [by] convincing him of their insurance expertise and that they had the Mahans' best interests at heart."  After finishing this project, the Chan Defendants, with the assistance of the Thai Defendants, "turned their focus to the Mahans' existing life insurance [policies], offering to review and, if appropriate, fine tune the life insurance component of the Mahans' estate plan."  Early in their dealings with Fred, the Respondents "discovered" the Mahans' respective cognitive issues and proceeded to exploit the situation and betray their trust, driven by "an avaricious pursuit of a six-figure life insurance commission."[5]

---

[4] See 26 C.F.R. § 20.2042-1(c) (proceeds from insurance on decedent's life not includable in decedent's gross estate for federal tax purposes so long as decedent does not have "incidents of ownership" of the policy at the time of his death).

[5] Chan is the president and Kaddoura is an agent of the Chan Agency; Thai was a general agent of Transamerica, and also served as the president and CEO of ABN.  The FAC is sometimes specific as to which of the Respondents carried out the activity alleged on the part of all of them, but for the most part refers generally to conduct by "the Defendants," without always specifying what roles Chan, Kaddoura, Thai and their respective entities played.  It is a fair reading of the FAC, however, that the Chan Defendants, primarily, if not exclusively, dealt directly with Fred acting in a retail agency capacity, while the Thai Defendants worked in a brokerage capacity.  While most of the direct communications with Fred—and with Maureen, to the extent there were any with her—particularly at the outset of the alleged scheme, were undertaken by the Chan Defendants, the FAC alleges that "Thai and his company ABN were heavily involved

5

The Respondents also learned that the Children's Trust held two second-to-die joint life policies which the Mahans "had purchased many years earlier and which had accumulated substantial cash value."[6] One policy, from Reassure America (the Reassure America Policy), providing death benefits of $600,000, had a planned annual premium of $6,000; the other was from Sun Life of Canada (the Sun Life Policy), providing a death benefit of $540,000, with an annual planned premium of $8,000. Maureen, a beneficiary of both policies, owned the Reassure America Policy; the Trust owned the Sun Life Policy. The linchpin of the Respondents' scheme was the false representation to Fred that "he could use the cash value in the existing policies to get substantial additional coverage while keeping the annual premium costs at $14,000."

Once the Respondents convinced Fred of their ability to obtain more coverage without any increase in premium cost, they embarked on a course of conduct in which they manipulated the Trust by dealing almost exclusively with Fred, cutting Maureen out of the loop, and relying on their ability to get Maureen to "sign off" on transactional steps presented to her as having her father's approval. The Respondents knew of "Maureen's reliance upon her father's guidance" and exploited that trust and deference. They "went out of their way to accelerate and pressure Maureen's actions and limit her access to information, often providing her with only signature pages or blank forms to sign, and always having Fred Mahan sign first in order to signal his approval and recommendation."

from the outset of Defendants' predation" and were involved "at every step, from case design to underwriting."

[6] " '[S]econd-to-die' insurance is a form of joint life insurance that pays a death benefit only upon the demise of the second named insured to die. It is often used by a married couple in estate planning and is also called dual life insurance or survivorship insurance." (*Drelles v. Manufacturers Life Ins. Co.* (Pa. Super. Ct. 2005) 881 A.2d 822, 827, fn. 2.)

## 2. *The First Wave of Life Insurance Applications (March-June 2013)*

In March 2013, the Respondents "prepar[ed] and submit[ted] applications for life insurance on [both Mahans] to both Life Insurance Company of the Southwest . . . and Lincoln Benefit Life Insurance Company." Both applications were "either presented . . . in a way which deprived the Mahans of a meaningful opportunity to review them, or . . . simply [given to] . . . the Mahans [to] sign . . . before they were filled out."[7] "Had Fred been given a chance to review the Southwest and Lincoln Benefit applications before they were submitted, he . . . would have discovered that, instead of 'leveraging' the cash value in the Reassure America Policy and the Sun Life Policy, as Chan and Kaddoura had represented, Defendants were actually planning on replacing both policies."

In this first wave of applications, the Respondents went to great lengths to conceal the ownership of the life insurance they were seeking, which allowed them to obscure the fact they were planning a replacement of coverage, not simply the purchase of additional coverage. In five applications submitted in May and July 2013, the Respondents "concealed either one existing policy or the other," listing the Mahans, not Maureen, as the owners. All of the applications the Respondents submitted between March and May 2013 were eventually denied, with each of the insurers citing Martha's cognitive disorder and "abnormal lab[]" results for Fred as the reason for the denial.

In June 2013, having failed in their first series of attempts to arrange replacement coverage for both existing policies, the Respondents took a different tack. By that point, it was clear to them that Martha was uninsurable due to her Alzheimer's disease diagnosis, so they decided to apply for a new policy insuring only Fred. This change in course would later turn out to have significant consequences. Among other things, it created the prospect of a sharp escalation in cost, for in seeking single-life coverage the

---

[7] The applications contained several basic errors indicating that no one who actually knew Fred or who had tried to obtain accurate information about him had been consulted in the course of preparing them. For instance, the "applications sa[id] [Fred Mahan's] birthplace [was] 'Lebanon' when in fact he was born in West Virginia"; they also misspelled Frederick's name as "Fredrick."

7

"the premiums on a . . . policy insuring only Fred Mahan would be higher than the premiums on a joint-life policy insuring both of the Mahans." It also fundamentally undermined any pretense that "additional" insurance could be obtained without additional premium cost. The Respondents pressed ahead anyway. Motivated by their own self-interest and "determined to earn a six-figure commission," the Respondents "proceeded to prepare and submit more life insurance applications."

3.     *The Purchase of the Transamerica Policy (July-August 2013)*

Because obtaining term insurance of any kind, given Fred's age—then 82—was going to be enormously expensive, the Respondents developed a strategy to leave the Sun Life Policy in place, while arranging to have the Trust borrow against its cash surrender value. By raising cash through a loan against the Sun Life Policy, the Trust could then pay the high initial payment that would be required to place the insurance. For a purchase of term life insurance structured in this way, the Respondents submitted two applications in July 2013, one to Transamerica, and one to American General. At that point, they still had not yet discussed anything with Maureen about what they were doing. And as they had done with the prior, unsuccessful applications, the Respondents had Fred sign blank or incomplete applications before Respondents themselves completed and submitted them.

"When Defendants steered [the Mahans and the Trust] into funding the initial premium on the Transamerica Policy by borrowing against the Sun Life Policy, they failed to disclose . . . the fact that there would be an additional cost for the loan [because] . . . an annual payment of the loan interest [would have to be made] or that unpaid interest would be deducted from the cash value and reduce the death benefit. A loan against the Sun Life Policy would [be] a short-term loan because it would reduce the net cash surrender value to under $235,000.00 within a year. Defendants had the Sun Life Policy Statement of Value and knew, but did not disclose, that borrowing funds from that policy without additional funding would jeopardize the policy by putting it in danger of lapsing."

8

In seeking to place this new coverage, the Respondents' gamesmanship concerning policy ownership continued. The Notice Regarding Replacement accompanying the Transamerica application stated that Fred was "the 'Contract Owner' for the Sun Life Policy when, in fact, [the Respondents] knew the policy was owned by the [Children's Trust]." On both the Transamerica application and on the American General application, the Respondents "pretend[ed] to replace the Sun Life Policy when in fact they were going to replace the Reassure America Policy and borrow against the Sun Life Policy." There was also no indication in either application that Martha was one of the insureds. Had the Respondents identified Martha as an insured or listed Reassure America as the policy being replaced, "they would have jeopardized their scheme" by triggering a deeper inquiry by the insurance companies into what was going on.

The Transamerica application, which is attached as an exhibit to the FAC, was given to Fred in blank, with an "X" encircled next to several places on it where he was expected to sign. "Only after Fred Mahan signed those forms did Defendants complete and submit them to Transamerica." Among the documents submitted with the Transamerica application were forms entitled "Absolute Assignment to Effect Internal Revenue Code Section 1035 Exchange and Rollover," and a "Notice Regarding Replacement [:] Replacing Your Life Insurance or Annuity[]." These forms were left blank. In submitting the application, the Respondents, as life insurance experts, "knew that replacing the joint-life Sun Life Policy (or the joint-life Reassure America Policy) with the single-life Transamerica Policy did not qualify as an IRS Section 1035 Tax-Free Exchange, thereby exposing the cash surrender value of the Reassure America [P]olicy to income taxes."[8] "Notwithstanding their knowledge that they were purporting to surrender a joint-life policy for a single-life policy, Defendants prepared, presented and

---

[8] Federal taxation may be avoided on an exchange of insurance policies involving the trade of one policy for another. (26 U.S.C. § 1035(a)(1).) No taxable gain is recognized in such an exchange, but only if the trade is for a policy of like kind. (26 C.F.R. § 1.1035-1(a).)

had Fred Mahan sign . . . a Transamerica illustration which still assumed a legally impossible 1035 [E]xchange."

Ultimately, the Transamerica application was successful, resulting in the issuance of a new term life policy (the Transamerica Policy) in September 2013 covering Fred, providing death benefits of $1,174,100 for an initial payment of $251,303.63[9] and an annual premium thereafter of $101,500, terminating on Fred's 91st birthday. When the Transamerica Policy issued, so focused were the Respondents on making sure that they were paid the $100,000 commission they were due that they "failed to deliver" the policy as issued and neglected to pass along crucial pricing information from Transamerica. In issuing the coverage, it turned out, Transamerica indicated that, to defray the high initial payment—which Respondents had already arranged to fund by the surrender of the Reassure America Policy—Fred had the option of paying a lower upfront premium and paying a higher interest rate. The availability of this option showed it was unnecessary to surrender the Reassure America Policy, but neither Fred nor Maureen was advised of it.

Summing up the workings of this alleged scheme up to its culmination upon issuance of the Transamerica Policy, the FAC alleges that the "Defendants completed the sale of the Transamerica [P]olicy through a parade of . . . wrongful acts, errors and omissions[,] . . . includ[ing], . . . forging signatures, failing to provide [the Mahans and the Trust] . . . complete copies of the documents they had signed, concealing (or otherwise negligently failing to disclose) the true . . . economics of the Transamerica transaction, concealing (or otherwise negligently failing to disclose) the tax consequences of surrendering the Reassure America Policy, concealing (or otherwise negligently failing to disclose) material facts about the loan being taken against the Sun Life Policy, and concealing (or otherwise negligently failing to disclose) the fact that they were

_____

[9] "The total initial payment for the Transamerica [P]olicy was $251,303.63, comprised of the surrender value of the Reassure America Policy in the amount of $140,668.63, the liquidation of Sun [L]ife stock (that had been received when Sun Life demutualized) in the amount of $43,000, and [a] loan on the Sun Life Policy of $67,635.00." There appears to be no dispute that, at the time the Children's Trust paid these amounts to Transamerica, the funds were property of the Trust, not the Mahans.

10

extinguishing insurance coverage on Martha Mahan and at a time of her life when she had become uninsurable."

4. *The Consequences to the Mahans and to the Children's Trust*

The Respondents' scheme had a series of negative financial consequences, impacting the Trust as well as the Mahans. First, the Trust was drained of cash because (1) "the annual insurance premium [owed by the Children's Trust] [increased] by more than $100,000," and over the life of the Transamerica Policy "left the trust obligated to pay . . . over $1 million in additional premiums," (2) the Trust owed the Respondents over $100,000 in commissions, and (3) the Trust paid Transamerica $251,303.63 for the initial payment. Second, one of the primary tax advantages of using joint life insurance as the form of asset conveyed through the Trust to the children was destroyed. Because "the Reassure America Policy was not surrendered through a 1035 [E]xchange (and could not be, because it went from a joint-life to a single-life policy), there would be taxes owed on the funds Maureen Grainger received [upon surrender]. Defendants knew about those tax consequences but did not explain them to Maureen . . . or the Mahans."

Third, to keep the Trust afloat, the Mahans were "forced . . . to sell assets so they [could] put significantly more of their personal money into the [Children's Trust] in order to pay insurance premiums and interest to prevent the [Sun Life and Transamerica] insurance [policies] from lapsing," and now they must continue paying money into the Trust to sustain it. Fourth, (1) the Reassure America Policy was extinguished (by its surrender), (2) the accumulated cash value of the Sun Life Policy was wiped out (by its encumbrance with debt), and (3) the whole life, last-to-die joint survivorship coverage formerly provided by both the Reassure America Policy and the Sun Life Policy, together, was replaced with far less valuable and more limited term life insurance on Fred's life alone. "After Fred Mahan turns 91, the Transamerica [P]olicy will terminate and all premiums paid, including the initial payment of $251,303.63, will be forfeited." In contrast, for the coverage which they gave up, "the Mahans paid an annual premium of only $6,000.00 for the $600,000.00 Reassure America Policy, a policy that would not

11

terminate as long as the premiums were kept current."

It also turned out that "Fred Mahan never understood in 2013 that he would be forced to deposit into the . . . [Children's Trust] over $800,000.00 in premiums for the Transamerica [P]olicy, a policy that would terminate when Fred turned 91. When Maureen . . . and Fred . . . questioned Chan about the actual premium costs of the Transamerica [P]olicy, in December of 2014, Chan's initial response was that Fred could just borrow against his real estate to pay the premiums . . . ." "When Fred . . . objected to borrowing against [his and Martha's] real estate, Chan's response was to propose a reduction in the Transamerica [P]olicy coverage." To Fred and to Maureen, this exchange with Chan brought into sharp focus the adverse financial consequences of what had occurred, so they sued.

## C.     Respondents' Demurrers and the Trial Court's Ruling

The trial court sustained an initial round of demurrers to the original complaint, granting leave to amend. Following that order, the Mahans filed the FAC, alleging that (1) all of the Respondents, either directly or by assisting the principals, committed financial abuse against elders, the Mahans, in violation of the Elder Abuse Act; (2) all of the Respondents were negligent; (3) the Chan Defendants breached one or more fiduciary duties, in violation of, at least, Insurance Code sections 785 and 10509.4; (4) the Chan Defendants committed fraud; and (5) all of the Respondents engaged in unlawful, unfair, and deceptive business practices under Business and Professions Code section 17200 et seq.

The Chan Defendants' demurrer challenged all five of the Mahans' causes of action, while the Thai Defendants' demurrer challenged only the first, second and fifth causes of action (the only claims on which they were named as defendants). The grounds for the demurrers, neither of which attacked the Trust's ability to pursue relief on the second through fifth causes of action, substantially overlapped. Each focused in rifle-shot fashion on the Mahans' Elder Abuse Act claim. The Mahans' basic argument in support of that claim was that the Respondents' alleged scheme "deprived [them] of

12

property rights" under section 15610.30 by, in essence, "forc[ing]" them to conduct a "donative transfer[]" to the Children's Trust. Based on the Mahans' concession that neither of them legally owned the Transamerica life insurance policy, because neither legally owned the Children's Trust (the Trust was indisputably owned by Maureen and the children were trustors), the Respondents argued that "Fred Mahan may have been acting as Maureen's adviser and agent and the rest of it, but he wasn't the one who lost anything. He was a conduit."

The trial court agreed, ruling that the Mahans' Elder Abuse Act claim fails to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) "[T]he allegation that Defendants' predatory scheme 'forced' the Plaintiffs to put money into the Children's Trust . . . fails to allege elder financial abuse," the court explained, "because the transfer of funds by the Mahans to the Trust for their children's benefit was a voluntary act that occurred after Defendants' alleged fraudulent scheme. The Mahans' property (money) went not to the Defendants, the alleged abusers, but to the Trust for the benefit of the children. . . . Such allegations do not suffice to show that Defendants took, appropriated, secreted, obtained or retained (or assisted in taking etc.) the Mahans' money by way of a donative transfer, as Plaintiffs assert."

On the same reasoning, the court sustained the Respondents' demurrers as to the Mahans' claims for negligence, breach of fiduciary duty, fraud, and violation of section 17200, adopting the Respondents' argument that "those causes of action fail because Plaintiffs have not alleged financial loss or harm." The court did, however, once again grant the Mahans leave to amend, noting there were some allegations in the FAC that appeared to allege in the alternative that Fred was the true owner of the Transamerica Policy, and that, if the Mahans could "allege truthfully that Fred was the actual policy owner/direct obligor, however, they may be able to allege that they suffered financial harm as a result of Defendants' scheme."

Ultimately, as masters of their own complaint, the Mahans declined to abandon their primary theory—which accepted that the Children's Trust is the owner of all of the

life insurance policies at the center of Respondents' scheme—in favor of an alternate theory that would have committed them to prove that Fred was the "real owner" of the Transamerica Policy, an approach to pleading their claims which in many respects would have been inconsistent with the documentary evidence attached to the FAC. They chose instead to stand on the FAC, as pleaded. The court then entered judgment dismissing all causes of action as to them, with prejudice, while leaving intact the second through fifth causes of action to the extent the Trust may wish to assert them. A final, appealable judgment having been entered as between the Mahans and the Respondents (see *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437), this appeal followed.

## II. DISCUSSION

### A. The Elder Abuse Act Cause of Action

In construing the Elder Abuse Act, we begin with its words. (*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 155 (*Winn*).) We are guided by the ordinary meaning of those words, "[their] relationship to the text of related provisions, terms used elsewhere in the statute, and the overarching structure of the statutory scheme. [Citations.] When the language of a statutory provision remains opaque after we consider its text, the statute's structure, and related statutory provisions, we may take account of extrinsic sources—such as legislative history—to assist us in discerning the Legislature's purpose." (*Id*. at pp. 155–156.)

#### 1. *Statutory Text*

"Financial abuse" claims are authorized in the Elder Abuse Act by section 15657.5, which works hand-in-hand with a set of defined terms in sections 15610.30 and 15610.70. As provided in Section 15610.30, subdivision (a), " '[f]inancial abuse' of an elder . . . occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud,

14

or both.  [¶]  (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence," as defined in section 15610.70.

Section 15610.30, subdivision (c) defines the phrase "[t]akes, secretes, appropriates, obtains, or retains" as occurring "when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult."  Section 15610.30, subdivisions (a), (b) and (c), together, define the requisite level of culpability broadly.  The defendant will be liable for "depriv[ation]" (§ 15610.30, subd. (c)) of an elder's property that is taken "for a wrongful use or with intent to defraud" (*id.*, subd. (a)(1), (2)), *or* that is committed by "undue influence" (*id.*, subd. (a)(3)).

The terms "wrongful use" and "undue influence" are specifically defined as well. "A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity…knew or should have known that this conduct is likely to be harmful to the elder or dependent adult."  (§ 15610.30, subd. (b).)  " 'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity."  (§ 15610.70.)  The test for "undue influence" is governed by a series of listed factors, including the "vulnerability of the victim" (§ 15610.70, subd. (a)(1)), the "influencer's apparent authority" (*id.*, subd. (a)(2)), the "actions or tactics used by the influencer" (*id.*, subd. (a)(3)), and the "equity of the result" (*id.*, subd. (a)(4)).

No one disputes that the Mahans were "elders" when the acts alleged in the FAC took place, or that the alleged chicanery of the Respondents, either directly or in assisting one another, potentially exposes them to liability under the statute—*if* the Mahans have adequately alleged a "deprivat[ion]" of the "property of an elder" for a "wrongful use" or by "undue influence."  Placing great emphasis of the words "the property of an elder,"

15

the Respondents contend the Mahans were not "deprived" of any such property, and, even assuming there was a "depriv[ation]" of something, the Trust owned whatever was allegedly taken here. Thus, it is claimed, the Respondents committed no statutory violation because they "did not 'take the property of an elder' to get the commission they allegedly were paid."

Although we are skeptical of such a stingy reading of the statutory text, the position the Respondents take does have some surface appeal. There is no dispute that, long before Respondents came on the scene, the Mahans arranged to place ownership of the life insurance policies at issue in either Maureen or the Children's Trust, apparently for tax purposes; that they ceded all control of the Trust and its assets to Maureen as the trustee; and that, as trustee, Maureen was obligated to pay whatever premiums were owing on the life insurance policies. Since Respondents' position that the Elder Abuse Act does not apply on these facts rests on a reasonably plausible reading of the statutory text, we pause briefly to review the genesis of sections 15610.30, 15675.5, and 15610.70, so that we may consider these provisions within the overall structure of the Act and take legislative history and purpose into account in applying them.

## 2. *Statutory History and Purpose*

The Legislature recognizes that elders are a class of persons who are particularly vulnerable to abuse and that "this state has a responsibility to protect" them. (§ 15600, subd. (a); see *Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1139–1140.) Enacted in 1982 with that broad purpose in mind, the Elder Abuse Act now protects elders by providing heightened remedies that encourage private enforcement of laws against abuse and neglect. (*Winn, supra,* 63 Cal.4th at p. 155; *Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 82.) To this end, civil actions may be brought under the Act for "physical abuse" (§§ 15610.63, 15657), "neglect" (§§ 15610.57, 15657), or "financial abuse" (§§ 15610.30, 15657.5).

When the Elder Abuse Act was enacted, its primary focus was on data collection and encouraging the reporting of claims as a way of facilitating criminal enforcement.

16

(*ARA Living Centers-Pacific, Inc. v. Superior Court* (1993) 18 Cal.App.4th 1556, 1559–1560.)  In 1991, "the focus shifted to private, civil enforcement of laws against elder abuse and neglect."  (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33; see § 15657.3.)  A key objective of the 1991 amendments was to remedy the fact that "few civil cases [were being] brought in connection with [elder abuse] due to problems of proof, court delays, and the lack of incentives to prosecute these suits."  (§ 15600, subd. (h); see Cal. Elder Law Litigation: An Advocate's Guide (Cont.Ed.Bar 1st ed. May 2016) § 6.2, p. 6-4.)

The template for private enforcement in cases involving physical abuse or neglect was set by the addition of section 15657 to the Act in 1991.[10]  Section 15657 has been amended several times since then, but the core of it remains the same today.  It sets forth a scheme of heightened remedies—punitive damages (§ 15657, subd. (c)), attorney's fees and costs (*id.*, subd. (a)), and exemption from certain limitations on recoverable damages in survivorship actions (*id.*, subd. (b))—designed to provide incentives for "interested persons to engage attorneys to take up the cause of abused elderly persons . . . ."  (§ 15600, subd. (j).)  These remedies are available only where the plaintiff proves by clear and convincing evidence that "the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse."  (§ 15657.)[11]

"Financial abuse" began to garner concentrated legislative attention in the late

---

[10] Statutes 1991, chapter 774, section 3, adding article 8.5, "Civil Actions for Abuse of Elderly or Dependent Adults," to the Act.

[11] "The courts are divided over whether this section and related provisions create independent cause of actions or merely enhance the remedies available under pre-existing causes of action.  (See *Perlin v. Fountain View Management, Inc.* (2008) 163 Cal.App.4th 657, 664–666 . . . [discussing division of authority concerning §15657, which addresses physical abuse of an elder]; Balisok, Elder Abuse Litigation, [(The Rutter Group 2008)] ¶ 8:9, p. 8-5 (rev. #1, 2009) ['Whether "financial abuse" amounts to a new cause of action or whether it is remedial is an important question.'].)"  (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 743–744.)  We need not address this question, since no party has raised it and in any event we conclude the Mahans have adequately alleged various causes of action which, if proved, would constitute predicate torts.  (See *post,* Section II.B.)

17

1990s.  From the mid-1980s, "fiduciary abuse" had been among the types of elder abuse covered by the Act,[12] but beginning in 1997 the Legislature took a series of steps to strengthen the remedies available for financial injury inflicted on elders by those who misuse positions of trust and confidence.[13]  The first step the Legislature took, in 1998, was to substitute the phrase "financial abuse" for the narrower phrase "fiduciary abuse" throughout the Act.[14]  Then, in 2004, it created a new class of claims for "financial abuse," enacting a private enforcement provision—section 15657.5[15]—tailored to these claims in particular.  Section 15657.5 sets forth a scheme of heightened remedies closely paralleling those available under section 15657, but with some key differences, principally that attorney's fee and cost awards are available for "financial abuse" claims proved by the preponderance of the evidence, while clear and convincing evidence remains the standard applicable to fee and cost recovery for claims of "physical abuse" or "neglect."[16]

---

[12] See Statutes 1985, chapter 1120, sections 6 and 7, repealing and reenacting section 15610, with fiduciary abuse added in subdivision (f).

[13] After some years of experience with the Elder Abuse Act, it appears to have been clear to the Legislature that the problem it originally sought to address in the Act goes far beyond cases where the health and safety an elder is at risk, i.e. "physical abuse" or "neglect."  (See Stats. 1998, ch. 946, § 1 [legislative finding that, based on statistics shown by mandatory elder abuse reporting laws enacted in 1982, 32 percent of reported cases of elder abuse involve "fiduciary abuse"].)

[14] Statutes 1998, chapter 946, section 5, amending section 15610.30.

[15] Statutes 2004, chapter 886, section 4.

[16] Compare section 15657 (heightened remedies available "[w]here it is proven by clear and convincing evidence that a defendant is liable for physical abuse . . . or neglect . . . and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse") with section 15657.5 (under subdivision (a) "[w]here it is proven by a preponderance of the evidence that a defendant is liable for financial abuse . . . the court shall award to the plaintiff reasonable attorney's fees and costs"; and under subdivision (b), all other heightened remedies are available where it is "proven by clear

In 2007, the Legislature, acting on reports that the intent to encourage private claims by "providing for enhanced remedies . . . 'has largely been unrealized . . . ,' "[17] made available the remedy of prejudgment attachment as a way to facilitate quick recovery of losses in "financial abuse" cases. (§ 15657.01; Stats. 2007, ch. 45, § 1.) In 2008 the Legislature acted again, broadening the defined term "financial abuse" and making procedural changes designed to facilitate the bringing of "financial abuse" claims. In an extensive set of amendments, the Legislature, among other things, (1) redefined what it means to take property for a "wrongful use," replacing the prior requirement that "bad faith" be shown with a standard based on the whether the defendant "knew or should have known" of "likely" harm to the elder (§ 15610.30, subd. (b));[18] (2) redefined the phrase "takes, secretes, appropriates, obtains, or retains" so that any "depriv[ation]" of property was subject to liability, including "by means of agreement, donative transfer, or testamentary bequest, and regardless of whether the property is held directly" by the elder or on his behalf by a third-party (§ 15610.30, subd. (c));[19] and (3) created a new basis for liability, adding "depriv[ation]" of property by "undue influence" (§ 15610.30, subd. (a)(3)) as a ground for suit separate from

and convincing evidence that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of the [financial] abuse").

[17] Assembly Committee on Judiciary, Analysis of Senate Bill No. 611 (2007–2008 Reg. Sess.) as amended May 31, 2007, page 2.

[18] Statutes 2008, chapter 475, section 1; see Senate Committee on Judiciary, Analysis of Senate Bill No. 1140 (2007–2008 Reg. Sess.) as amended March 10, 2008, page 9 ("This definition of taking for a wrongful use would shift the proof required from the defendant's knowledge or presumed knowledge of the elder's or dependent adult's right to the property taken, to the defendant's knowledge or presumed knowledge of the effect of the taking on the elder or dependent adult, to which a reasonable person standard may be applied.").

[19] Statutes 2008, chapter 475, section 1.

19

"depriv[ation]" "for wrongful use or with intent to defraud" (§ 15610.30, subd. (b)).[20]

### 3. *Application of the Act*

With this quick sketch of the statutory history in mind, we turn to a specific application of the Elder Abuse Act on the record here. Most of the questions raised by this appeal are easily answered by resort to the statutory text, either plainly applied, or when read in light of statutory context and history. But to the extent there is room for reasonable debate, we resolve those questions in favor of the Mahans. (See *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 295 [a remedial statute is to be "liberally construed on behalf of the class of persons it is designed to protect"].) As further explained below, we view Respondents' narrow construction of the Elder Abuse Act as incompatible not only with its overall remedial purpose, but also with the breadth of the "financial abuse" provisions of the Act as those provisions have evolved by amendment in recent years.

### a. "Depriv[ation]"

Since the Respondents are alleged to have arranged for a restructuring of insurance policies the Mahans do not own, at an increased premium cost the Mahans are not obligated to pay, the threshold question presented here is whether the FAC adequately

---

[20] (Stats. 2008, ch. 475, § 1; see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended June 17, 2008, p. 4 [This bill "add[s] undue influence as a third basis for financial abuse of an elder or dependent adult[,] [which proponents of the bill contend] is necessary because elders are often exploited through undue influence and under circumstances where the statutory elements necessary for financial abuse . . . are lacking . . . ."].) When enacted, section 15610.30 borrowed a definition of the term "undue influence" from Civil Code section 1575. By amendment in 2013, the Legislature revised this definition, dropping the old Civil Code formulation of the term (which dated from 1872), restating it in a new defined term located within the Elder Abuse Act itself—current section 15610.70—and updating the definitional language in detail to capture the variety and characteristic features of "undue influence" as it is often perpetrated on elders in today's world. (Stats. 2013, ch. 668, § 3; see Sen. Com. on Judiciary, Analysis of Assem. Bill No. 140 (2013–2014 Reg. Sess.) as amended June 14, 2013, pp. 1–4.)

alleges that the Respondents took anything from the Mahans in a manner that is cognizable under the Elder Abuse Act. We think it does.

The text of section 15610.30 is broad. It speaks not only of "taking" real or personal property, but also "secreting, appropriating, obtaining, or retaining" such property (§ 15610.30, subd. (a)(2); accord, *id.,* subd. (a)(1)), and then, to capture the sense of all of these terms, goes on to use the more expansive term "deprive." (§ 15610.30, subd. (c) ["a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right"].) Some of the terms used in section 15610.30 are narrower than others; to "secret," for example, suggests hiding or concealment, and to "retain" or to "obtain" suggests affirmatively acquiring possession of something. But we have no trouble concluding that the broadest of these terms—the word "deprive"— in its ordinary meaning covers what the Mahans have alleged. (See § 15610.30, subd. (c); Oxford English Dict. Online (2017) ["Deprivation" means "[t]he action of depriving or fact of being deprived; the taking away of anything enjoyed; dispossession, loss"] at <www.oed.com> [as of August 23, 2017].) The trial court's determination to the contrary relies heavily on the fact that the Mahans gifted (or intend to gift) whatever money or assets they transferred (or will transfer) to the Trust, but in our view this makes no difference. The Act, as amended in 2008, expressly contemplates that liability may flow from deprivations carried out by "a person or entity . . . by means of an agreement, donative transfer, or testamentary bequest . . . ." (§ 15610.30, subd. (c).)

The Respondents acknowledge that under section 15610.30, subdivision (c), the taking of an elder's property via donative transfer can be a deprivation of an elder's property, but they see no deprivation here because "the money was given by the Mahans to the Trust rather than *taken* by the respondents *by means of* a donative transfer." (Italics in original.) This line of argument incorrectly assumes that a deprivation must involve the direct taking by one person of the property of another, as if there were some kind of privity requirement. We see nothing in text of the statute requiring that. The linchpin of

21

the alleged scheme by Respondents was the "donative transfer" of money and assets by the Mahans to the Trust.  The allegations of the FAC may reasonably be read to aver that, by artifice and manipulation designed to take advantage of Maureen's willingness to follow what she perceived to be her father's wishes, the Respondents deprived the Mahans of property indirectly, using the Trust as an instrument of their scheme.

b.      "Property of an Elder"

Perhaps the most challenging aspect of this appeal, and the focus of most of the Respondents' attention, is the further question whether any losses claimed by the Mahans may be considered "the property of an elder."  The Respondents insist that the FAC alleges, at most, a "depriv[ation]" of property belonging to the Trust, not to the Mahans. Naturally, the Mahans disagree, claiming they were deprived of their "right[s]" in three pieces of "property":  (1) damage to their "estate plan," (2) loss of the money they felt compelled to transfer to the Children's Trust to pay for the Transamerica term coverage, and (3) loss of the money they felt compelled to transfer to the Children's Trust to pay the Respondents' commissions.  We agree with the Mahans.

First, we consider the Mahans' theory that their "estate plan" was damaged. Respondents argue that an "estate plan" cannot be a property right, and strictly speaking, they are correct, but what they overlook is that the estate plan alleged here was simply the vehicle by which the Mahans sought to convey assets by gift to their children.  Those assets took the form of second-to-die joint survivorship life insurance policies.  As alleged in the FAC, the two chosen policies had unique characteristics and value, in that: (1) they accumulated cash surrender value over time and were permanent until the last of the Mahans passed away (i.e., they were whole life policies on two lives and did not expire on a date certain, as term insurance does), and (2) in combination, they were dramatically cheaper than the restructured coverage put in place by the Respondents.  By alleging that the Respondents steered the Mahans into transactions that, in effect, destroyed the value they intended to convey to their children when they chose these two second-to-die joint survivorship life insurance policies as their preferred form of gift

22

asset, we think the FAC alleges a legally cognizable "depriv[ation]" of a "property right" under the language of section 15610.30, subdivision (c), as amended in 2008. We agree with the Mahans, therefore, that "[b]ecause Defendants' misconduct made the donation or voluntary transfer of" the Mahans' chosen gift assets "in their estate plan much more expensive and of lesser value, [their] right to dispose of their property has been damaged." (See *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 480 [where defendants manipulated 88-year-old plaintiff suffering from Alzheimer's disease into signing escrow instructions that impeded sale or encumbrance of real estate owned by plaintiff's trust, the "adverse financial impact of the escrow instructions [was] sufficient to allege a 'depriv[ation] of [a] property right . . . by means of agreement' " within the meaning of section 15610.30, subd. (c), because the restrictions on alienability deprived her and the trust "of one of the incidents of property ownership"].)

The value embodied in the Reassure America Policy and the Sun Life Policy was intrinsically personal to each of the Mahans. Subdivision (a) of section 10110 of the Insurance Code provides, in relevant part, that "[e]very person has an insurable interest in the life and health of: [¶] (a) [h]imself." (See also Ins. Code, § 10110.1, subd. (b) ["An individual has an unlimited insurable interest in his or her own life . . . and may lawfully take out a policy of insurance on his or her own life"].) We believe a statutory "insurable interest" is properly considered a "property right" within the meaning of section 15610.30.[21] Granted, in 2013, the Mahans' eligibility for life insurance as new applicants

---

[21] (See *Fields v. Michael* (1949) 91 Cal.App.2d 443, 449 (*Fields*) [" '[T]he word "property" may be properly used to signify any valuable right or interest protected by law . . . [but] the meaning to be given to the word depends upon the sense in which it is used, as gathered from the context and the nature of the things which it was intended to refer to and include.' "]; see also *Estate of Sigourney* (2001) 93 Cal.App.4th 593, 603 ["The concept of property in California is extremely broad."]; *Yuba River Power Co. v. Nevada Irrigation Dist.* (1929) 207 Cal. 521, 523.) Respondents emphasize throughout their briefs, as they did in the trial court, that the Mahans did not own the two whole life policies at issue here. But transferring or assigning the ownership of an insurance policy does not defeat the insurable interest of the insured. (See Ins. Code, § 10110.1, subds. (a), (b) & (f); *In re Marriage of Bratton* (1994) 28 Cal.App.4th 791, 794; see also

23

was subject to many health-dependent variables for which the Respondents cannot be held responsible, but that looks at insurability from the wrong point in time. Because the Mahans enjoyed whole life coverage as of *the inception* of the two joint survivorship policies at issue here (see Ins. Code, § 286 ["an interest in the life or health of a person insured must exist when the insurance takes effect"]), they would never have had to qualify as insurable again absent Respondents' machinations. This is not a case in which the Respondents arranged to swap one term policy for another, less valuable one. They are alleged, instead, to have stripped the Mahans of the ability to deliver one of the key features that anyone seeks in whole life coverage—a lifelong right to death benefits payable to the beneficiary, so long as premiums are paid. Due to the ticking of the actuarial clock and their declining health, these elders can never again qualify for life insurance of the same value they secured in the mid-1990s. Once they suffered a "depriv[ation]," the value of that asset cannot be restored any more than the clock can be turned back.[22]

---

*Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman Irrevocable Life Trust* (C.D. Cal. 2009) 638 F.Supp.2d 1170, 1177–1179; *Curtiss v. Aetna Life Ins. Co.* (1891) 90 Cal. 245, 250, 252–253.) The Thai Defendants assert that "the insurable interest really at stake was not that of the Mahans: it was that of Maureen . . . , owner of the Reassure America Policy . . . [,] and the Trust, owner of the Sun Life Policy . . . ." We disagree. The Mahans may have ceded to Maureen and to the Trust all rights to control and receive payout on these policies, but the underlying insurable interests—which are bound to them *as the insureds*—were essential to giving the "bundle of rights" they transferred $1,000,000 in value.

[22] On rehearing, in response to our request for briefing specifically directed to the insurable interest issue, the Chan Defendants point out that the insurable interest requirement is nothing more than a "prerequisite to taking out a life insurance policy" and serves to outlaw wagering contracts on the lives of third parties. We agree that Insurance Code section 10110 is designed to prohibit wagering contracts on human life, but it does so by, among other things, recognizing in every "individual . . . an unlimited insurable interest in his own life." (Ins. Code, § 10110.1, subd. (b).) None of the parties brings to our attention any case that sheds light on whether an insurable interest under this statute may be considered "property" for purposes of the Elder Abuse Act. The Thai Defendants, while contending that the question is a novel one, cite by analogy *Sandrosky*

Second, we examine the alleged "depriv[ation]" of the Mahans' "property right[s]" in funds paid for the Transamerica term coverage. We split this question into two parts, looking first at the initial payment to Transamerica, and then looking at the money paid or to be paid for annual premiums. Because the initial payment was made from funds generated directly from the Reassure America and Sun Life policies (see *ante,* fn. 9), we view this money as part of the value of that whole life coverage; Respondents are alleged to have obstructed its transferability to the Mahans' children. As for premiums paid or payable on the Transamerica Policy over and above the $14,000 annual premium cost of the two joint survivorship policies they intended to pass to their children, the Mahans have had to reach into their pockets and sell assets to provide more cash to the Children's Trust than they ever planned to do. By alleging that the Mahans were "forced" to transfer more of their own money into the Children's Trust than they anticipated and sell some of their personal assets to do so—which the Respondents well knew would happen—we are satisfied the FAC has sufficiently alleged Respondents "deprived [the Mahans] of [their] property right[s]" (§ 15610.30, subd. (c)) in that money. Stating things in blunt terms, the FAC alleges that, by manipulation and use of the Children's Trust as an instrument, the Respondents managed to separate the Mahans from their money. That, in our view, constitutes a "depriv[ation]" of "property."

Third, we consider whether, when Respondents were paid their commissions, they "deprived" the Mahans of the "property of an elder."[23] Courts have found in a number of

_____

*v. Prudential Ins. Co.* (1933) 217 Cal. 578 and *Mayfield v. Fidelity & Casualty Co.* (1936) 16 Cal.App.2d 611, which are marital property cases; and the Chan Defendants, for their part, cite a tax case, *Hoffman v. Connell* (1999) 73 Cal.App.4th 1194. Stated as a general matter, these cases address whether the *beneficiary* of a life insurance policy or a trust has a future expectancy that may be deemed to be his or her property for purposes of a marital property settlement (*Sandrosky*, *Mayfield*) or for tax purposes (*Hoffman*). We are not dealing here with the interests of beneficiaries, and in any event, these cases fit comfortably within the more generally-framed, context-specific rule in *Fields.* (See fn. 21, *ante*.)

[23] The Thai Defendants argue that, read closely, the FAC never actually alleges that they received any commissions. The Chan Defendants, for their part, argue that any

25

settings that commissions paid by a third party to a defendant arising from an abusive transaction are sufficient to constitute elder abuse. (See, e.g., *Wood v. Jamison* (2008) 167 Cal.App.4th 156, 164–165 [a finder's fee paid from the lender sufficient]; *Zimmer v. Nawabi* (E.D. Cal. 2008) 566 F.Supp.2d 1025, 1034 (*Zimmer*) [commission paid by mortgage broker sufficient]; *Negrete v. Allianz Life Ins. Co. of N. Am.* (C.D. Cal. 2015) 927 F.Supp.2d 870, 890–893 (*Negrete*) [commissions from churning insurance policies sufficient].) Here, whether the commission money flowed *directly* into the Respondents' pockets, it seems to us, makes no difference. The Mahans have alleged that the Respondents' "scheme depleted all of the cash in [the] trust" and that, as a result, all commission payments by the Trust are fairly traceable to them.

At bottom, the Respondents' insistence that any compensation for their services came from the Trust, and that the Mahans never paid a dime themselves, strikes us as an argument going to the scope of the relief available, not to the question of whether a claim for relief has been stated in the first instance. Certainly, the adverse financial consequences flowing from the Respondents' actions cannot be awarded twice in damages, both to the Trust and to the Mahans, but any damages apportionment issues must be dealt with as a matter of proof, not as a matter of pleading. On this record, we cannot say what specific items of damages may be awardable to the Mahans, as distinguished from the Trust. All we can say definitively is that (1) it can be fairly inferred from the allegations of the FAC that the Mahans suffered at least some damages unique to themselves,[24] and (2) the Respondents are entitled to object to any effort at

commissions were paid by Transamerica as part of the Trust's purchase of the Transamerica Policy. We think it can be fairly inferred from the FAC that the Respondents shared a $100,000 commission payment that was paid out by the Trust, or on behalf of the Trust, following the issuance of the Transamerica Policy.

[24] For example, the Mahans appear to have incurred attorney's fees and other expenses in setting up the Children's Trust, and according to the allegations in the FAC, that money has now been wasted, since the Mahans' fundamental objective in trying to convey a gift to their children through two last-to-die joint survivorship life insurance policies has now been derailed. And it may be that they can show they would have

26

double recovery.

### c. "Wrongful Use"

We look next to whether the FAC adequately alleges that any property of the Mahans was taken "for a wrongful use" under subdivisions (a)(1) and (a)(2) of section 15610.30. To show a likelihood that the alleged scheme here would be "harmful" to them and thus raise a presumption of "wrongful use" within the meaning of these subdivisions, the Mahans do not have to allege they might suffer "physical harm" or "mental suffering" from it (see *Bonfigli v. Strachan* (2011) 192 Cal.App.4th 1302, 1316; *Negrete*, *supra*, 927 F.Supp.2d at pp. 891–893), although the FAC does allege emotional distress to Fred. In addition, given their prior dealings with Fred, the Respondents knew enough about how the Mahans' estate was structured to understand the critical role last-to-survive joint survivor coverage played in their plans. The Respondents also knew early in 2013 that each of the Mahans was suffering from mental incapacity, yet chose to deal almost exclusively with them instead of Maureen. The Respondents further knew that Maureen, who lived in Oregon, would follow her father's advice in connection with Trust business.

When the Respondents' alleged scheme began, the Mahans had two existing whole life policies that provided satisfactory coverage, yet by using a position of trust and confidence the Respondents maneuvered them into an arrangement in which they effectively replaced the existing coverage—surrendering one policy, borrowing against the other and wiping out its accumulated cash surrender value—and arranged instead to have Fred buy a new single-life, time-limited policy with significantly higher premiums. To make matters worse, it turned out that, when all was said and done, based on a pricing option Transamerica offered, it was unnecessary to surrender the Reassure America Policy, yet the Respondents were so focused on getting their $100,000 commission that they never bothered to mention the availability of this option to Fred or Maureen, having

---

earned a return on the money they unexpectedly had to "feed" into the Trust to keep it afloat, or that they have been prevented from doing things they could have done had they retained this money (e.g. using it for Martha's care).

27

already rushed the surrender into effect.

There is enough here to say the Respondents "knew or should have known" of the "likely" harm their scheme would have on the Mahans. Chan's alleged statement to Fred and Maureen that the Mahans "could just borrow against [their] real estate" suggests an awareness Fred would need to call upon other assets to bear the dramatically increased cost burden the Respondents knew was coming. That alone is enough to justify an inference of the requisite knowledge. The Mahans also argue, and we agree, that another way to describe what the Respondents allegedly did—if true—is "churning," a term often used in the stock-trading context as "excessive trading done primarily to benefit the broker by generating commissions in excess of those justified."[25] (See *Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 188.) This case is similar to one from a federal district court (see *Zimmer*, *supra*, 566 F.Supp.2d at pp. 1033–1034), where the court held the insurance agents liable for financial elder abuse for what essentially amounted to a "churning." Just as in *Zimmer*, accepting the allegations of the FAC as true, the Respondents "wrongfully obtained [tens of thousands of dollars in commissions] as a result of [their] false statements about the terms of [the Mahans'] refinance, which [the Respondents] knew were less favorable to [the Mahans] than [their] previous [insurance policies]." (*Id*. at p. 1034.)

### d. "Undue Influence"

The last question we address in applying the Elder Abuse Act is whether the FAC sufficiently alleges "depriv[ation]" committed by "undue influence" (§§ 15610.30, subd. (a)(3), 15610.70), which is an alternative to "depriv[ation]" by "wrongful use or

---

[25] "Many older policyholders have years-old whole-life policies that have accumulated a sizable cash surrender value. An insurance agent encourages them to trade in these policies and buy new ones that pay higher death benefits. This practice, known as churning, earns the agent a large sales commission while substantially increasing the policyholder's premium cost. . . . [¶] Insurance agents' selling annuities of dubious value under the guise of estate planning is common." (Lawrence A. Frolik, Insurance Fraud on the Elderly (June 2001) TRIAL p. 2, at <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1428476> [as of August 23, 2017].)

intent to defraud" (§ 15610.30, subd. (a)(1), (2)), under the revised liability scheme created by amendment in 2008. We think the FAC sufficiently alleges the Mahans' felt need to pay more into the Trust to keep it afloat was brought about by "undue influence" as now defined in section 15610.70. The Respondents are alleged to have taken advantage of two aged individuals, both in a state of cognitive decline (§ 15610.70, subd. (a)(1))[26]; and, by use of their professed expertise as insurance professionals (*id.*, subd. (a)(2)), carried out an elaborate plan of replacing insurance on the victims' lives by "actions or tactics" that included "haste or secrecy" (*id.*, subd. (a)(3)(C)), ultimately visiting serious inequity on them, which included adverse "economic consequences," "divergence from [their] prior intent," and commissions paid that are out of proportion to the value of the services rendered to them (*id.*, subd. (a)(4)). Thus, the plain terms of section 15610.70, subdivision (a), fit what is alleged here quite well. The Respondents are free to argue in their defense that, factually, and as a matter of causation, the Mahans' actions in paying more money into the Trust were volitional and somehow independent of their alleged bad acts, but for now the FAC sets forth plenty to permit a finding to the contrary.

---

[26] The Chan Defendants filed a motion requesting that we take judicial notice of Fred's Mahan's status as an active member of the State Bar of California from April 22, 2013 through March 17, 2015. We granted that motion as unopposed on July 25, 2016, while reserving any ruling on relevance until we decided the merits of the appeal. We see no relevance to Fred's Bar status and have not considered it here. The FAC does not allege, nor do the Respondents attempt to argue, that Fred served as a lawyer to anyone in connection with anything having to do with the Children's Trust or with the life insurance policies at issue here. To the extent Fred's Bar status might have some bearing on his cognitive abilities and level of sophistication, perhaps that is an evidentiary issue for exploration at a later stage in the case, but it is immaterial to the issues presented by this appeal.

## B. Other Causes of Action

Finally, we address the trial court's dismissal of the Mahans' four remaining causes of action (negligence, breach of fiduciary duty under Ins. Code, § 785 et seq.,[27] fraud, and unlawful business practices under Bus. & Prof. Code, § 17200) based on its conclusion that the Respondents had not deprived the Mahans of a property interest, and thus the Respondents had not "injured" the Mahans. For the reasons explained above in concluding the FAC adequately alleges "depriv[ation]" of "the property of an elder" for purposes of the Elder Abuse Act, we conclude the court erroneously sustained the Respondents' demurrers as to these other causes of action. The analysis of injury is, in substance, the same.

The Chan Defendants contend the Mahans "forfeited" these four claims for lack of analysis and authority in their opening brief on appeal. We disagree. The trial court was clear in stating it denied all of the Mahans' five causes of action because they had "not alleged financial loss or harm." It is true that the Mahans focused their appellate briefs on the alleged harm they suffered in the context of "financial abuse" under the Elder Abuse Act. The trial court saw this line of argument as presenting a question common to all five causes of action, and so do we. We see no reason the "depriv[ation]" of "property" for "wrongful use" or by "undue influence" we have found sufficient for

---

[27] Insurance Code section 785, subdivision (a) provides in relevant part that anyone "engaged in the transaction of insurance" with an elder owes that person "a duty of honesty, good faith, and fair dealing." The Mahans moved this court on February 10, 2017, to take judicial notice of a letter of opinion, dated August 7, 2015, expressing the Department of Insurance's view of whether there "[i]s a private right of action afforded for the violation of Article 6.3 (California Insurance Code (CIC) § 785 et. [*sic*] seq.)?" We deny that motion. The trial court did not address whether Insurance Code section 785, subdivision (a), creates a private cause of action, and we decline to address it for the first time on appeal.

30

purposes of the Elder Abuse Act may not also serve as sufficient injury to support the second through fifth causes of action.[28]

## III.   DISPOSITION

We reverse and remand for further proceedings not inconsistent with this opinion. The Mahans shall recover their costs on appeal.

---

[28] At a number of places in the briefs, the Respondents argue the Mahans lack "standing" to sue.  "Standing, for purposes of the Elder Abuse Act, must be analyzed in a manner that induces interested persons to report elder abuse and to file lawsuits against elder abuse and neglect," and analysis of the issue "may be intertwined with other issues in elder abuse cases."  (*Estate of Lowrie* (2004) 118 Cal.App.4th 220, 230.)  Since we conclude the Mahans have sufficiently alleged "deprivat[ion]," "wrongful use," and "undue influence" in disposing of their "property" under the Elder Abuse Act, we necessarily decide they have "standing" to sue under the Act.  We so conclude with respect to the other causes of action as well.  (See *Surrey v. TrueBeginnings* (2008) 168 Cal.App.4th 414, 417 [under Code of Civ. Proc., § 367, the "existence of standing . . . requires that the plaintiff be able to allege injury, i.e., an invasion of his legally protected interests" that is "greater than the interest of the public at large and . . . is concrete and actual rather than conjectural or hypothetical"].)

_____
Streeter, J.

We concur:

_____
Ruvolo, P.J.

_____
Rivera, J.

A147236/*Mahan v. Charles W. Chan Insurance Agency, Inc.*

32

A147236 – *Mahan v. Charles W. Chan Insurance Agency, Inc.*


Trial Court:    Alameda County Superior Court

Trial Judge:    Hon. Stephen Kaus

Counsel:

Majors & Fox and Frank J. Fox; Law Offices of Mary A. Lehman and Mary A. Lehman for Plaintiffs and Appellants.

David M. Zeff, Samuel G. Ware, and Sara B. Allman for Defendants and Respondents Charles W. Chan Insurance Agency, Inc., Chung Wing Chan, Jr. and Omar Kaddoura.

Murphy, Pearson, Bradley & Feeney, John H. Feeney, Adam F. Sloustcher; D'Amato Law Corporation and Adam M. Koss for Defendants and Respondents Cung Thai and American Brokerage Network.